UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA             CRIMINAL NO. 06-50170-01

versus                               JUDGE STAGG

HAROLD ALEXANDER JACKSON             MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

### Introduction

Before the court is Defendant's Motion to Suppress Traffic Stop and All Evidence

Seized (Doc. 29).  For the reasons that follow, it is recommended that the motion be granted.

### Facts

An evidentiary hearing was held on February 26, 2007.  The evidence at the hearing

establishes the following facts.  On November 8, 2006, Louisiana State Trooper James Nash

was stationary in the median of I-20 in Bossier Parish, Louisiana.  At approximately 9:45

a.m., he observed a blue Acura driven by Defendant traveling east-bound and following too

closely behind a red or burgundy Pontiac.  The speed limit on that portion of I-20 is 60 mph,

and Trooper Nash clocked Defendant's speed at approximately 71 mph.

Trooper Nash left the median and pursued Defendant's vehicle.  When Trooper Nash

caught up to Defendant's vehicle, Defendant was still in the left or passing lane of I-20.

Trooper Nash then activated his emergency lights, and Defendant moved to the right lane and

onto the shoulder of the interstate.[1]   As soon as the cars came to a stop, Trooper Nash called

in the license plate on Defendant's vehicle. [9:33:55].[2] Tr. 24.

Trooper Nash exited his police car and walked to the right rear of Defendant's vehicle

and waited for Defendant in the grass near the shoulder of the highway. [9:34:30].

Defendant exited his vehicle and approached Trooper Nash.  Trooper Nash told Defendant

that he was following another car too closely.  Defendant shakes his head slightly, as if in

disbelief.  Trooper Nash asked Defendant for his driver's license and registration.  Trooper

Nash also asked Defendant if his travel was for business or pleasure.  Defendant said

"business."  Defendant stated that he currently lived in Mesquite, Texas but that he was going

to Atlanta, Georgia to "check on a place to stay."  Trooper Nash asked Defendant "What's

wrong with Mesquite?"  Defendant responded with words to the effect that the police in

Mesquite had beat him up.  Defendant then handed Trooper Nash his insurance card.  The

vehicle belonged to Defendant's sister, and Defendant could not find the registration.

Trooper Nash asked Defendant if he had places in mind to live in Atlanta and where

he was going to work in Atlanta.  Trooper Nash also asked Defendant if he was in the

---

[1]   When Trooper Nash activated his emergency lights, his dashboard camera came on automatically.  Accordingly, there is video and audio of the traffic stop.  Due to wind and traffic noise, however, it is sometimes difficult to hear and understand some of what was said by Defendant during the traffic stop.

[2]   References to the time in which something happened during the traffic stop are based on the times reflected on the videotape.  There is a slight discrepancy in the times shown on the videotape from the times reflected in Trooper Nash's report (Tr. 24), but the differences are not significant.

process of moving or if he was "just going to look."  Defendant then produced a binder of information that Defendant had on potential housing in the Atlanta area. Tr. 32.  Trooper Nash told Defendant that his information was pretty thorough. Tr. 39.  Trooper Nash then returned to his police car to call Defendant's information in to dispatch.  Trooper Nash offered to allow Defendant to wait in Defendant's vehicle, but Defendant elected to stand outside between the cars. Defendant asked for and received permission to smoke a cigarette. After Nash returned to the police car, Defendant lit a cigarette and stood on the edge of the shoulder of the interstate looking back in Nash's direction. [9:37:40].

Trooper Nash contacted dispatch by radio and requested an NCIC check on Defendant from Georgia and Texas. [9:38:24].  It took approximately three minutes for Trooper Nash to receive any information in response.  In the meantime, Defendant continued to stand on the side of the road, calmly smoking his cigarette, with his left hand in his pocket and looking back in Trooper Nash's direction.

Dispatch provided the following criminal history information regarding Defendant from Texas from 1990 to 2006: assault, burglary, dangerous drugs, possession of marijuana, resisting arrest, evading arrest, interference with the duty of a public servant, DWI, driving under suspension, and criminal trespass.[3] [9:41:34].  There were no outstanding warrants for Defendant.  About two minutes after receiving the criminal history for Texas, Trooper Nash

---

[3] The dispatcher does not use the word "convictions" so it is not clear whether Defendant's criminal history information is for arrests, convictions or some combination of the two. In any event, the Government did not show that the prior arrests resulted in convictions.

received the criminal history of Defendant for Georgia. [9:43:21].  The only information provided was first-offense public indecency in 1991.  Again, there were no active warrants for Defendant.  At this point, it appears that Trooper Nash turned off his microphone.  There are no recorded sounds for the next four minutes.  During this time, Defendant leaned up against the trunk of his car, calmly looking back in Trooper Nash's direction.

Trooper Nash then turned his microphone back on and exited his police car. [9:47:10]. Instead of issuing Defendant a citation and allowing Defendant to leave, Trooper Nash began interrogating Defendant further.  He asked Defendant whether his family was moving with him. [9:47:36].  Defendant responded that he had a fiancee.  Trooper Nash asked whether Defendant's fiancee was moving with him, and Defendant responded that he caught her sleeping with his best friend and, "She's no good."  Trooper Nash asked Defendant if he had been married before, and Defendant responded that he had been.  Trooper Nash then asked Defendant whether she (presumably his ex-wife) cheated on him or whether he cheated on her.  Trooper Nash told Defendant that his "luck ain't been good at all."  He also asked Defendant the last time that he had been arrested and why the police in Mesquite were beating him up.  Defendant's response was words to the effect that the police were sarcastic to him and they tried to make him angry.  Nash then asked Defendant how long he was going to be in Atlanta, whether he had family there and where he was going to stay when he got to Atlanta.

Trooper Nash also asked Defendant if the vehicle he was driving was in his name. [9:49:32].  Defendant responded that the car belonged to his sister.  Trooper Nash asked where his sister was located, whether she knew he had the car, and what she was driving. Defendant answered that his sister was "out of town herself" on vacation. [9:49:32].  Trooper Nash then told Defendant to "stand by," and he again returned to his patrol car. [9:49:58]. Defendant leaned back against the trunk of his car and shook his head slightly, as if in disbelief.

About a minute and a half later, Defendant made a hand motion and said something inaudible to Trooper Nash.  [9:51:42].  Trooper Nash exited his patrol car and Defendant told Trooper Nash about an approaching inmate work crew picking up garbage along the side of the interstate.  Trooper Nash told Defendant that the inmates had someone watching over them and following behind them in a vehicle.  Trooper Nash then returned to his car, and Defendant leaned back on the trunk of his vehicle.  The inmate garbage crew then walked by Defendant as they picked up trash on the side of the road. [9:54:18].

About 23 minutes into the stop, Trooper Nash exited his car and approached Defendant again. [9:56:49].  Trooper Nash returned Defendant's driver's license to him, and Defendants put it in his wallet.  Trooper Nash told Defendant that he was giving him a citation for following too closely.  Defendants asked questions about how to take care of the citation.  Trooper Nash told Defendant to call a specific number and he will be told how to take care of the payment.   He did not tell Defendant that he was free to go.  Tr. 57.

About 24 minutes into the stop, and after returning Defendant's license and handing Defendant the citation, Trooper Nash told Defendant, "We see a lot of bad things" up and down the interstate, such as "illegal people," "large amounts of money," "drugs, cocaine, marijuana, stuff like that." He asked Defendant if he had anything like that with him in his car. Defendant said no. Trooper Nash then said, "You mind if I search it?" Defendant's response is unclear due to the wind and road noise, but he can be heard saying "beat up," "don't mind your searching," and "nothing to hide." [9:57:53].

Trooper Nash then handed Defendant a Louisiana State Police consent to search form. [9:58:12]. Trooper Nash told Defendant to read over it, and "if you agree with it, sign it at the bottom." But, "If you don't agree, you don't have to sign it." Trooper Nash then invited Defendant to stand further off the shoulder in the grass so that Defendant "does not get run over." [9:58:27]. Trooper Nash's body partially blocked the camera's view of Defendant, but it is apparent that Defendant looked over the consent form. Defendant then said something to Trooper Nash that is not completely audible but sounds like he was saying that he wanted "to make sure he read the last one." [9:59:15]. Defendant handed the signed form to Trooper Nash. [9:59:30]. Trooper Nash called for back up on his radio.

Trooper Nash told Defendant to step over to the front of Nash's police car. While waiting for his back-up, Trooper Shane Sears, to arrive, Trooper Nash engaged Defendant in further conversation regarding the trip to Atlanta and whether Defendant had a meeting

that day to look at apartments.  He asked Defendant where he was born and whether he knew

or grew up with someone (the name is not clear from the audio).

Trooper Sears arrived about five minutes later. Tr. 58.  Trooper Nash told Defendant

that Trooper Sears was going to "stand by."  Trooper Nash asked Defendant if he had

anything that would hurt them, such as knives.  Defendant said no.  Trooper Nash then patted

Defendant down with one hand, while holding his clipboard (containing the consent form)

with his other hand. [10:01:30].   Trooper Nash then walked to Defendant's car, opened the

passenger door and began searching the car. [10:02:00].  During this time, Defendant leaned

against the right front fender of Trooper Nash's police car, just at the edge of the view of the

camera.  Trooper Sears stood to the right of Defendant, outside the view of the camera.

While Trooper Nash searched Defendant's car, Defendant and Trooper Sears were engaged

in conversation.  Tr. 62.  Trooper Sears did not activate his microphone, so there is no

recording of their conversation.

Defendant told Trooper Sears that he did not know why Trooper Nash was searching

his car.  Defendant admitted to Trooper Sears that he signed the consent form, but he thought

he was refusing the search.  Tr. 62.  Thus, about two and a half minutes into the search,

Trooper Sears approached Trooper Nash and stated that Defendant said he refused the search.

[10:04:20].   Trooper Nash responded, "he signed it."   Trooper Sears responded that

Defendant said that he signed it indicating his refusal.

Trooper Nash then returned to Defendant and asked Defendant if he refused. [10:04:35]. Defendant's response is difficult to hear and understand, but he can be heard to say, "I ain't got no problem with your searching it," and "I don't got nothing to hide anyway." Trooper Nash told Defendant that he told him to read over the form and if he agreed with it, to sign it. Defendant responded that "the only thing you have left [to search] is the trunk." [10:06:02].[4]

Trooper Nash told Trooper Sears, "Let's just do the dog." [10:06:02]. Trooper Nash then asked Defendant whether he could read and understand English. Defendant responded that he could. Trooper Nash told Defendant that he thought he understood. Defendant responded, "That's why I said let me look at that again." [10:07:00].

Trooper Sears removed his canine from his police car and walked the dog around Defendant's vehicle four times in a counterclockwise motion. [10:07:28]. Trooper Sears notified Trooper Nash that the dog alerted on the vehicle. Trooper Nash then opened the driver's door of Defendant's vehicle and continued the search. [10:09:26]. Trooper Nash continued his search of the vehicle until approximately 10:14:33 when he discovered a large quantity of illegal drugs in hidden compartments in the rear passenger area of Defendant's car. Defendant was placed under arrest and read his rights pursuant to <u>Miranda</u>.

---

[4]It is unclear whether Defendant was really confused about whether he consented to the search, whether he simply changed his mind or whether he was trying to distract Trooper Nash's attention away from the back seat area.

**Defendant's Motion to Suppress**

Defendant's Motion to Suppress (Doc. 29) argues that Trooper Nash did not have probable cause to initiate the traffic stop and that Louisiana Revised Statute 32:81, which makes it unlawful to follow another vehicle too closely, is unconstitutionally vague. Defendant also argues that his prolonged detention was unsupported by reasonable suspicion. Defendant further argues that, following his revocation of consent to the search of his vehicle, the officers lacked probable cause to search the vehicle.[5]

In his supplemental brief (Doc. 36), Defendant focused his argument on two main points: (1) the initial stop was unjustified because the videotape does not support Trooper Nash's testimony that Defendant was following a red or burgundy Pontiac too closely at the time of the stop; (2) Trooper Nash did not have reasonable suspicion to detain Defendant after the initial purpose of the stop had been fulfilled.

The Government's opposition to Defendant's motion to suppress (Doc. 32) argues that the traffic stop was legal at its inception. The Government further argues that the totality of the circumstances known to Trooper Nash, specifically Defendant's nervousness, perspiration on his forehead, and his comments about being beaten up by the police and Defendant's fiancee sleeping with his best friend, support a reasonable suspicion for further investigation. The Government further argues that Defendant gave oral and written consent

---

[5] Contemporaneously with the filing of his motion to suppress, Defendant filed a motion for a <u>Daubert</u> hearing (Doc. 30).  In his <u>Daubert</u> motion, Defendant challenges the admissibility of any testimony based on evidence generated by the canine search.

to the search of his vehicle, and when Defendant withdrew that consent, Trooper Sears immediately ran his canine around Defendant's car.  The Government points out that once the dog alerted, the officers had probable cause to search Defendant's car.

**Applicable Law – General Principles**

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV.  Traffic stops are deemed seizures for the purposes of the Fourth Amendment. United States v. Valadez, 267 F.3d 395, 397 (5th Cir.2001).  The legality of a traffic stop is analyzed under the framework articulated in Terry v. Ohio, 392 U.S. 1 (1968). See Knowles v. Iowa, 525 U.S. 113, 117 (1998); Berkemer v. McCarty, 468 U.S. 420, 439 (1984); United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004)(en banc). Under the two-part Terry reasonable suspicion inquiry, the court must determine whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20; Brigham, supra at 506-507; U.S. v. Lopez-Moreno,  420 F.3d 420, 429-434 (5th Cir. 2005).

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. See United States v. Breeland, 53 F.3d 100, 102 (5th Cir.1995). The Supreme Court has stated that in making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal

wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Cortez,

449 U.S. 411, 417 (1981).  Reasonable suspicion exists when the officer can point to specific

and articulable facts which, taken together with rational inferences from those facts,

reasonably warrant the search and seizure. See, e.g., United States v. Santiago, 310 F.3d 336,

340 (5th Cir.2002).  In evaluating the totality of the circumstances, a court may not consider

the relevant factors in isolation from each other. Arvizu, 534 U.S. at 274.  In scrutinizing the

officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not

suffice. Terry, 392 U.S. at 27.  It is also clear, however, that reasonable suspicion need not

rise to the level of probable cause. Arvizu, 534 U.S. at 274.

As for the second prong of the Terry inquiry, generally, the "detention must be

temporary and last no longer than is necessary to effectuate the purpose of the stop, unless

further reasonable suspicion, supported by articulable facts, emerges." Brigham, 382 F.3d at

507.  In the course of effectuating the stop, a police officer may permissibly examine the

driver's license and registration and run a computer check on them to investigate whether the

driver has any outstanding warrants and if the vehicle is stolen. Id. at 507-08.   An officer

may also ask the driver about the purpose and itinerary of his trip. Id. at 508.  Indeed, the

officer's questions need not even be related to the purpose of the traffic stop, since

"[d]etention, not questioning, is the evil at which Terry's second prong is aimed." Id.

Although an officer's inquiry may be wide-ranging, once all relevant computer checks

have come back clean, there is no more reasonable suspicion, and, as a general matter,

continued questioning thereafter unconstitutionally prolongs the detention. Brigham, 382 F.3d at 510.  See also Santiago, 310 F.3d at 341-42; United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000); United States v. Dortch, 199 F.3d 193, 200 (5th Cir.1999), *corrected on denial of rehearing*, 203 F.3d 883 (5th Cir. 2000).  A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. See Brigham, 382 F.3d at 507; United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003).

Courts have found reasonable suspicion to justify the continued detention of a motorist based on a variety of factors.  Two of the most frequently cited factors are nervousness and inconsistent statements.  While they are relevant factors in evaluating reasonable suspicion, see e.g., United States v. Powell, 137 Fed. Appx. 701, 707-708 (5th Cir. 2005), they have been found, when standing alone, insufficient to support reasonable suspicion of illegal drug trafficking.  Santiago, 310 F.3d at 342.  "A stopped individual may be nervous for many reasons, and although it might be because the individual is trafficking drugs, the nervousness could equally be caused by the fact that the defendant is nervous about having committed a wide variety of other crimes, including the very traffic offense for which he was pulled over for."  U.S. v. Grier, 127 Fed.Appx. 712, 715 (5th Cir. 2005).[6] See

_____

[6] While not binding on this court, the Tenth Circuit has stated that "nervousness is of limited significance in determining reasonable suspicion" and the Government's repeated reliance on nervousness as a basis for reasonable suspicion "must be treated with caution."

also <u>United States v. Estrada</u>, 459 F.3d 627, 631 (5th Cir. 2006)("Mere 'uneasy feelings' and inconsistent stories between a driver and passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking.").

Eye contact, or the lack thereof, is also frequently cited as a factor in evaluating reasonable suspicion. <u>See e.g.</u>, <u>Brigham</u>, 382 F.3d at 508;  <u>United States v. Sanchez</u>, 2007 WL 1191180 (5th Cir. 2007)(eye contact was one of several factors cited by the court in finding reasonable suspicion during a traffic stop; defendant averted his eyes when asked if he was carrying contraband); <u>United States v. Davis</u>, 2007 WL 1125763 (E.D. La. 2007)(defendant would not look at the officer directly when asked about his itinerary, but did look at him when answering more general questions).  The avoidance of eye contact may (or may not) be entitled to weight; it is simply one factor in observing overall behavior.  <u>United States v. Aldaco</u>, 168 F.3d 148, 152 (5th Cir. 1999).  However, "reasonable suspicion should not turn on the ophthalmological reactions of appellant." <u>Id</u>.  <u>See</u> <u>also</u>  <u>United States v. Vega</u>, 254 F.3d 70 (5th Cir. 2001)("We recognize that the failure of a driver to make eye contact with officers cannot support an officer's reasonable suspicion.").

Criminal history is another frequently cited factor.  However, prior arrests, also standing alone, do not amount to reasonable suspicion.  <u>Dortch</u>, 199 F.3d at 196, 199; <u>Jones</u>,

---

United States v. Fernandez, 18 F.3d 874, 879 (10th Cir. 1994).  <u>See</u> <u>also</u> <u>United States v. Jones</u>, 269 F.3d 919 (8th Cir. 2001)(nervousness is of limited significance).  But nervousness is, of course, a relevant factor in considering the totality of the circumstances. <u>Id</u>.  <u>United States v. Peek</u>, 184 Fed. Appx. 782 (10th Cir. 2006).

234 F.3d at 242.  See also United States v. Bentley, 151 Fed. Appx. 824, 829 (11th Cir. 2005)(criminal history, standing alone, does not give rise to reasonable suspicion).  Prior arrests for drug trafficking, along with other factors, such as nervousness, hesitation in responding to itinerary questions, lies about identification, and presence on a drug trafficking corridor, have been held to give rise to reasonable suspicion of drug trafficking.  Brigham, 382 F.3d at fn. 8, citing United States v. Gonzales, 328 F.3d 755, 758 (5th Cir. 2003); United States v. Davis, 2007 WL 1125763 (E.D. La. 2007)(numerous factors gave rise to reasonable suspicion, including that defendant lied about his prior narcotics arrest).

An officer's subjective intentions have no impact on analyzing reasonable suspicion or probable cause because they are both considered to be based on an objective test. Devenpeck v. Alford, 543 U.S. 146 (2004) ("Our cases make clear that an arresting officer's state of mind ... is irrelevant to the existence of probable cause.  [H]is subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."); Whren v. United States, 517 U.S. 806 (1996) ("We think these cases ... foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved.").  See also Goodwin v. Johnson, 132 F.3d 162, 173 (5th Cir. 1997).

**Pre-Brigham Decisions**

Several pre-Brigham cases, due to their similar facts and circumstances, are instructive in the resolution of the issues before the court: United States v. Dortch, 199 F.3d

Page 14 of  39

193 (5th Cir. 1999) *corrected on denial of rehearing*, 203 F.3d 883 (5th Cir. 2000), United States v. Santiago, 310 F.3d 336 (5th Cir. 2002) and United States v. Jones, 234 F.3d 234 (5th Cir. 2000).

In Dortch, two officers stopped a vehicle at approximately 11:30 p.m. for traveling too closely on I-20 in Beaumont, Texas.  The driver exited the car at the officer's request and produced his license and car rental papers, and he consented to a pat down search for weapons.  No weapons were found.  The officer examined the rental papers and determined that the car was rented to a third person and the driver was not listed as an authorized driver. The officer then questioned the driver and his passenger.  The men gave inconsistent answers about the driver's relationship to the person who had rented the car and their travel plans.

While one officer questioned the driver, the other officer performed a computer check for warrants and to determine whether the car was stolen.  About eight minutes into the stop and while the computer check was pending, an officer requested consent to search the vehicle.  The driver gave consent to search the trunk, but not the vehicle; no search was performed at that time.

The officers told the driver he would be free to leave after the check for warrants was complete but that the officers would detain the car until they had performed a canine search of it.  A canine unit was then called.  The driver was again patted down for weapons and again nothing was found.

About 14-15 minutes into the stop, the officers received the driver's criminal record and questioned him about it.  The driver was not told that the computer check was complete, although it was, or that the driver would be free to go at any time.  Approximately 19-20 minutes after the stop began, the officers noticed the arrival of the canine across the four-lane interstate and median.  At that time, they informed the driver that the computer check had been completed and turned up nothing, but that the canine was going to perform a search nonetheless.  The driver remained at the scene, and his driver's license and rental papers remained with the officers on the clipboard.

Another ten minutes elapsed during the canine search.  The canine alerted on the driver's side door and seat.  However, the subsequent search of the car uncovered no contraband.  The canine handler then informed another officer that there could be contraband on the body of the person who had been sitting in the driver's seat.  The driver then consented to a third pat down search.  This time, however, the officer conducted a more thorough search of the driver's person and noticed a large hard bulge in his crotch area.  The bulge was bags of cocaine.  The driver was later charged with and found guilty of possession with intent to distribute cocaine.

On appeal, the driver did not question the legality of the initial stop, the canine search of the vehicle or the first two pat down searches.  Instead, he argued that at some point the detention became unreasonable and exceeded the scope of intrusion allowed under Terry and, therefore, the subsequently discovered cocaine was inadmissible as fruit of the poisonous

tree.  Alternatively, he argued that the third pat down search was itself unreasonable because of a lack of probable cause or consent.

The Fifth Circuit found that, while the detention and questioning of the driver during the running of the computer check was lawful, the Constitution was violated when the detention extended beyond the valid reason for the initial stop.  Dortch, 199 F.3d at 198.  The driver did not feel free to leave even after the computer check was completed, because the officers still held his license and rental papers and they told him they were going to detain the car until the canine arrived.  The driver's acquiescence to stick around while the dogs completed their search could not be considered voluntary.

There was no reasonable suspicion that the driver was involved in drug trafficking. Id. at 199.  The answers he and the passenger gave, even if suspicious, did not give rise to that inference.  Rather, the answers gave rise only to a reasonable inference that the car might have been stolen.  When the computer check came back negative, the driver should have been free to leave.  Once he was not permitted to drive away, the extended detention became an unreasonable seizure because it was not supported by probable cause.

The officers offered no justification for the 9-10 minute delay in requesting the canine. Id. at 200.  The officer's main duty was drug interdiction, including checking suspected vehicles for narcotics.  It was reasonable, therefore, to expect that they would have anticipated needing a canine within a few minutes of stopping a suspect.  Although the dog's alert on the car established probable cause to search the interior of the car and to detain the

Page 17 of  39

driver until a more thorough search could be completed, by then it was too late – any probable cause established as a result of the canine search was subsequent to the unlawful seizure.  Id.

The Court then addressed the issue of consent.  Although the driver's detention exceeded the scope of a Terry stop, his consent to search may, but does not necessarily, dissipate the taint of a prior Fourth Amendment violation.  Where there has been a prior constitutional violation, the government's burden to prove the defendant consented becomes more difficult.  Id. at 201.  Consent does not remove the taint of an illegal detention if it is the product of an illegal detention and not an independent act of free will.  Id. at 202.  In light of the prolonged unlawful detention of the driver, and in light of the fact that his previous refusals to consent to searches of the car were seemingly ineffective, the Court found that his consent could not be considered an independent act of free will.  The Court noted that it was apparent from the videotape that the officers intended all along to detain the car until the dog arrived.

The Fifth Circuit concluded that, even if the driver's consent was voluntarily given, the consent was not valid. Because the causal chain between the illegal detention and the consent to the third body search was not broken, the search was nonconsensual.  And because there was no probable cause to search the driver's person, the evidence obtained during that search should have been suppressed.  Id. at 202-203.

In United States v. Santiago, supra, the trooper pulled the defendant over on the belief that the motorist's view was unlawfully obstructed by trinkets hanging from the motorist's rearview mirror.  310 F.3d at 338-39. The defendant also was traveling 50 mph in a 70 mph zone.  After stopping the motorist, the trooper began to suspect that the car was stolen: the driver appeared nervous because his hands were shaking, the driver was traveling straight through to a distant destination, the driver could not remember his wife's name, the driver's vehicle was registered in another woman's name who was not the defendant's wife, and the driver had an explanation that was inconsistent from that of his passenger as to the parties' ultimate destination.

The officer then ran a computer check of the defendant's license and registration, which eventually came back negative.  Instead of returning the defendant's license and registration, the trooper called for and waited for backup.  The officer then explained problems with drugs being smuggled on the interstate highways, and he asked for and obtained consent to search the car.  A sealed compartment was discovered in the trunk.  The trooper then called for a canine which alerted on the car.  A subsequent search at the state police headquarters revealed drugs concealed within a false floor.

The Fifth Circuit concluded that the factors upon which the officer relied were insufficient as a basis for reasonable suspicion of drug activity because the officer had not articulated an objective basis to warrant a finding that Santiago had narcotics in his vehicle sufficient to justify the extended detention of him. Id. at 342.  The trooper's original

justification for the stop ended at the time the computer check was completed.  At that point, there was no reasonable suspicion that the defendant was trafficking in drugs, but the trooper nonetheless continued his interrogation.  The court also noted that Santiago was stopped at 9:00 a.m; the highway on which he traveled was not deemed a major drug corridor; and Santiago's computer check did not elicit that he had a prior arrest or criminal record.  There also was no evidence that, before asking for consent to search, the trooper had returned the driver's license and registration to defendant or told him that he was free to go.  Under the circumstances, it was unreasonable for the trooper to continue to detain the defendant after the records check was completed.  The Fifth Circuit concluded that the defendant's consent to search was not an independent act of free will, but rather a product of an unlawfully extended detention.  Id. at 343.

In Jones, an officer pulled a motorist and his passenger over for a speeding violation. 234 F.3d at 237. The officer detained the defendant three minutes beyond the completion of the computer check, obtained the defendant's consent to search his vehicle, and subsequently found illegal narcotics. Id. at 241-42. The officer's basis for reasonable suspicion of drug activity pointed to the following facts: the defendant's inconsistent statement's regarding his place of employment, the defendant's contradictory responses about his passenger's employment, and the fact that the defendant's passenger had been previously arrested for a cocaine charge. Id.

The Fifth Circuit concluded that, based on the totality of the facts, that officer's three minute detention of Jones after the completion of the computer check was unreasonable. Jones was stopped in the morning (11:57 a.m.); Jones was not traveling on a known drug corridor; and neither Jones, nor his passenger, had criminal histories.  Compared to the facts in Dortch, the Fifth Circuit explained that the trooper's bases for reasonable suspicion were even less suggestive of reasonable suspicion and were "at best trivial."  Id. at 241.  The defendant's consent to search was not valid because the causal chain between the illegal detention and the consent was not broken.  Id. at 342.  Therefore, the search was nonconsensual.  Id.

## Brigham

Against the backdrop of Dortch, Santiago and Jones, the court now turns to Brigham. Brigham did not overrule Dortch, Santiago and Jones, and later Fifth Circuit cases continue to cite them. See, e.g., United States v. Schlieve, 159 Fed. Appx. 538 (5th Cir. 2005); United States v. Powell, 137 Fed. Appx. 701, 709 (5th Cir. 2005);  Lopez-Moreno, 420 F.3d 420, 431; United States v. Estrada, 459 F.3d 627, 632 (5th Cir. 2006).   Indeed, Brigham cited (and, at times, distinguished) Dortch, Santiago and Jones. 199 F.3d at 506, 507, 508, 510 and 511.

In Brigham, the driver and three friends were pulled over at approximately 4:13 p.m. on a highway in East Texas for following too closely.  The officer approached the driver and asked him to step out of the car and provide his license and insurance papers.   The driver

complied and produced a car rental agreement listing a 50 year old female as the lessee.  No other drivers were authorized on the rental agreement.  It did not appear that the 50 year old female was among the passengers in the car, so the officer became suspicious.  The officer began asking the driver a series of basic questions about his group's travel plans.  The driver stated they were coming from Houston.  The driver stated they had stayed at a La Quinta Inn, but he had difficulty explaining where the motel was located.  The driver also avoided eye contact and appeared to be extremely nervous.  He responded to the officer's questions with questions of his own.  Based on the officer's experience, he believed the driver was fabricating answers to the questions, and the officer decided to verify the driver's story with other occupants of the car.

At 4:17 p.m., four minutes after the stop began, the officer asked a passenger to step out of the vehicle.  The passenger produced an I.D. card that the officer suspected was fake.  The passenger's description of the group's travel plans was inconsistent with that offered by the driver.  The passenger also avoided eye contact and appeared extremely nervous.

At 4:20 p.m., the officer questioned the other two occupants.  Both appeared confused and also were inconsistent concerning the group's travel plans.  The officer then returned to his car to run computer checks on the car and the I.D. cards he had received.  He told the driver that if his license was clean, they would soon be back on their way.  Even though the car checked out, the officer remained suspicious given the behavior of the driver and occupants, their inconsistent descriptions of their travel plans and because, in his experience,

the fact that a car is not yet reported stolen does not necessarily indicate that it was not actually stolen.

At 4:29 p.m., the results of the I.D. checks suggested that one of the occupant's I.D. card was likely a fake.  The officer confronted that occupant and eventually learned his real name.  The officer then returned to his car to check the occupant's actual identity.   While that check was pending, the officer requested and received back-up from another officer.

The officer then provided the driver with a written warning for following too closely and returned his driver's license to him.  He explained to the driver that one of his responsibilities was to intercept illegal contraband such as guns, stolen property and narcotics.  The driver denied that any illegal items were in the car and acceded to a request for a search.   The officer removed all of the passengers from the car and patted them down.  At 4:42 p.m., approximately thirty minutes after the stop began, the officer discovered a cooler containing liquid codeine located in the trunk of the car.

The driver did not challenge the validity of the initial traffic stop.  Instead, he argued that the officer exceeded the scope of the valid stop and prolonged the occupants' detention excessively and unconstitutionally when, after determining that neither the driver nor the other occupants of the car were its authorized drivers, the officer interrogated them about their travel plans and then instituted computerized vehicle and I.D. checks.

The initial panel decision held that the officer unconstitutionally extended the traffic stop by questioning the driver *before* he began a computer check on the I.D.s and the rental

car's registration.  The panel also held that the driver's consent to search the vehicle was involuntary because it was tainted by the Fourth Amendment violation.  The underlying conviction was reversed.

The en banc Fifth Circuit found no Fourth Amendment violation and affirmed the conviction.  According to the Court, the panel's decision erroneously required the officer to return to the patrol car immediately after the officer learned that none of the occupants seemed to be an authorized driver and undertake a registration check to determine whether the car had been reported stolen.  Such an approach "misunderstands the Supreme Court's insistence on reasonableness rather than prescriptions for police conduct under the Fourth Amendment and extends this circuit's precedents too far."  Id. at 507.  Instead, the "correct analysis requires district courts to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances."  Id.  The detention must be temporary and "last no longer than necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges."  Id., citing Dortch, 199 F.3d 200.

There is no constitutional impediment to an officer's request to examine a driver's license and vehicle registration or rental papers during a traffic stop and run a computer check on them.  Id. at 508.  The officer also may ask about the purpose and itinerary of a driver's trip.  Such questions may efficiently determine whether a traffic violation has taken

place, and if so, whether a citation or warning should be issued or an arrest made.  All of these inquiries are within the scope of investigation attendant to the traffic stop.  Id.

The Court rejected any notion that a police officer's questioning, even on a subject unrelated to the purpose of a routine traffic stop, is itself a Fourth Amendment violation.  Id. "Detention, not questioning, is the evil at which Terry's second prong is aimed."  Id.  "Mere police questioning, without some nonconsensual restraint on one's liberty, is not a 'seizure' or detention."  Id.  A consensual interrogation may follow the end of a valid traffic stop, and such a consensual encounter does not implicate Fourth Amendment concerns.  Id.

The officer's questioning of the driver and the occupants was within the scope of the detention justified by the traffic stop, particularly after the officer ascertained that the driver was not the owner or lessee of the vehicle; the lessee was not present in the car; and the versions of the itinerary conflicted.  The process, from the time the officer started questioning the driver until he returned to his patrol car to check the registration, lasted only seven minutes.

Equally within the legitimate scope of the stop were the registration and license checks that the officer performed on the vehicle and its occupants.  And once the officer learned that one occupant's I.D. card was a fake, he acted reasonably through further questioning to uncover the occupant's true identity and perform a correct background check. Because the officer was still waiting for the computer check at the time that he received

consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation.  Id., citing Shabazz, 993 F.2d at 437.

The Fifth Circuit emphasized that there is "no constitutional stopwatch on traffic stops."  Id. at 511.  Instead the relevant question in assessing whether a detention extends beyond a reasonable duration is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly."  Id. Computerized license and registration checks are an efficient means to investigate the status of a driver and his auto, but they need not be pursued to the exclusion of, or in particular sequence with, other efficient means.  Id.  There is no single formulaic approach that an officer must adopt in order to allay his reasonable suspicions during a traffic stop.  Id. at 512. According to the Court:

> [W]e do not presume to prescribe in the abstract the scope of questioning, investigative techniques, or the length of permissible detention that may be undertaken following a valid traffic stop.  The bounds of existing caselaw are clear, if fact-intensive: **a traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop**. [Emphasis added.]

Id.  Because there was no Fourth Amendment violation, the driver's consent to search the vehicle was not unconstitutionally tainted.  His consent was voluntarily given, and the evidence obtained from the car was properly obtained as the result of a consensual search. Id.

**Analysis of this Case**

### A.  The Initial Traffic Stop

Defendant went to great lengths, including the use of an expert in video production, to try to convince the court that the initial traffic stop in this case was not justified.  However, based on the testimony of Trooper Nash, the undersigned is satisfied that the traffic stop was justified at its inception.

Trooper Nash offered credible testimony that Defendant was following another car too closely.  The fact that the red or burgundy car is not shown in the videotape (Tr. 79) does not disprove or diminish the initial justification for the stop.  Instead, it is more likely that, when Defendant noticed Trooper Nash behind him, Defendant decreased his speed and the red or burgundy vehicle he was following continued on at a faster pace. Tr. 88.  Thus, when Trooper Nash activated his lights (and dashboard camera) the red or burgundy vehicle Defendant was following could no longer be seen on the videotape. See Santiago, 301 F.3d at 341 (initial stop was justified "although it was doubtful [driver] could have been convicted" for the traffic violation; driver was "arguably in violation of the statute."); United States v. Pena, 2007 WL 1011441 (5th Cir. 2007)(initial stop was justified when the officer had reasonable suspicion that a traffic law violation occurred; the issue is not whether the statute was violated but whether it was reasonable for the officer to believe it was violated).  Trooper Nash's testimony about the stop, which is accepted as credible, establishes that Nash had an objectively reasonable basis to believe that Defendant was following too closely,

which provided justification for the initial stop.  Furthermore, Trooper Nash clocked Defendant's vehicle traveling at approximately 71 mph in a 60 mph zone, providing Trooper Nash probable cause to stop Defendant for speeding.

**B.  Reasonable Suspicion For Continued Detention**

The more difficult question is whether Trooper Nash unconstitutionally prolonged Defendant's detention.  As explained above, once the purpose of a valid traffic stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts. Estrada, 459 F.3d at 631.  In Estrada, another traffic stop case, the Fifth Circuit stated that the purpose of the initial traffic stop ended when the results of the criminal background check came back negative, unless the officers formed additional reasonable suspicion *before that time*.  Id. at 631, citing Brigham.  In that case, the officers had formed additional reasonable suspicion before that time when they discovered indications that the vehicle had a false compartment that had recently been used.

On direct examination at the suppression hearing in this case, Trooper Nash testified only briefly regarding Defendant's behavior and demeanor during the stop.  He testified that Defendant's hand was trembling when he handed him his driver's license. Tr. 6 .  He also testified that Defendant would not look at him when he was talking to him.  Id.  On redirect examination, Trooper Nash testified that he also noticed sweat starting to form on

Defendant's forehead, which he found odd because it was a nice, cool sunny day.[7]  Tr. 53,

58.  He also testified that he found it "odd" that Defendant stated he was getting beat up in

Mesquite and wanted to move to Atlanta.  Tr. 54.  Trooper Nash stated that he had never

heard that before.  Id.

On cross-examination, Trooper Nash was pressed to identify "each and every factor"

that he would characterize as unusual behavior by Defendant.  Tr. 33.  Nash again referenced

Defendant's failure to make eye contact; his trembling hand when Defendant handed him his

driver's license; and a little sweat starting to build up on Defendant's forehead.  Tr. 33.

When pressed again to identify any other things he noticed that were unusual, Trooper Nash

also pointed out that Defendant's hand was "fidgeting in his pocket."  Tr. 37.

When relevant portions of the videotape were played in court during the hearing,

Trooper Nash was asked to point out any other behaviors that he believed supported

reasonable suspicion to continue the detention.  Tr. 38, 39.  Nash conceded that the video did

not show Defendant's hand fidgeting.  Tr. 38.  When shown the portion of the tape where

Defendant is standing outside of his car, looking back at Trooper Nash (who was then

running the driver's license and criminal history checks), Trooper Nash could not identify

anything about Defendant's behavior that caused any suspicion or created any fact to rely

---

[7]Trooper Nash recorded the temperature at the time of the stop as 55 degrees.  Tr. 25.
Defendant introduced a weather history for Shreveport (Defendant's Ex. 1) which suggests
the temperature was  between 68 and 75 degrees.  Tr. 27.  In any event, the video shows, and
the testimony confirms, that it was a sunny, clear day.  Tr. 30.  The video also shows that
Trooper Nash, Trooper Sears and Defendant were dressed in short-sleeved shirts. [10:04:20].

upon to continue the detention.  Tr. 42.  Defendant's smoking a cigarette was not unusual
(Tr. 39); he was looking back in Trooper Nash's direction (Tr. 40-41); and he was not fidgety
(Tr. 41).  During this time period, Trooper Nash does not see Defendant "doing anything
wrong..."  Tr. 42. Trooper Nash further testified:

Q.    So we have fidgety hands and avoiding – continuing to avoid eye contact.  And those
      are the two things that you found to be unusual behavior?

A.    Yes, sir.

Q.    You found those things, I'm sure, to be indicators that criminal activity was occurring
      or about to occur, correct?

A.    Yes, sir.

Q.    Can you describe for the Court how fidgety hands, if they exist in that tape, and
      avoiding continued eye contact, what crime or series of crimes does that indicate to
      you is about to occur or has occurred?

A.    I just feel like he could have been trying to conceal something.  Are you talking about
      the entire stop, or are you just talking about that portion?

Q.    Well, you say in your report that you recognize him not keeping eye contact with you
      to be deceptive.

A.    Yes, sir.

Q.    That's not indicative of any particular crime, correct?

A.    (No verbal response.)

Q.    Correct?

A.    I just felt like he wasn't being honest, sir.  It's a –

                              *     *     *

Q.   And honesty or failure to be honest with you is not indicative of any particularized crime, is it, sir?

A.   No, sir.

Q.   Lots of folks aren't honest with you, aren't they?

A.   Correct.

Q.   Lots of folks lie to you, don't they?

A.   Yes, sir.

Q.   But that doesn't mean they are necessarily going to commit a crime, does it sir?

A.   Right.

Tr. 45-46.

With regard to nervousness, Trooper Nash admitted that it is not unusual for people to be nervous when they are stopped by him.  Tr. 6.  But the video, rather than showing any nervousness on the part of Defendant, shows Defendant calmly smoking his cigarette while Trooper Nash was running his information through dispatch.  With regard to Defendant's hand fidgeting in his pocket, Trooper Nash admitted that the video does not confirm his recalled observation.  Tr. 48 ("You can't see it.  I could see it.").  With regard to sweat building on Defendant's forehead, Trooper Nash admitted that "it's common knowledge that folks sweat," and that various factors determine how much people sweat, including their size, their metabolism and the heat of the sun, and none of those facts have anything whatsoever to do with unusual or suspect behavior.  Tr. 36.  With regard to moving to Atlanta, Trooper

Nash admitted that Defendant did produce "some evidence that he was actually going to Atlanta to look for housing." Tr. 32.

The totality of factors or indicators relied upon by Trooper Nash do not amount to reasonable suspicion of drug trafficking or other illegal behavior. Most people are nervous when they are stopped by police on an unfamiliar highway while traveling away from home. It is common for someone to demonstrate some nervousness, i.e., shaking of the hand, when handing the trooper his or her driver's license. The recording of the stop, however, shows that any nervousness on the part of Defendant quickly subsided. He responded to Trooper Nash's questions with complete answers, he was not evasive and his eye contact increased as the stop went on. When Trooper Nash was running Defendant's information through the computer, Defendant stood in front of Trooper Nash's car (after having declined the invitation to sit and wait in his own car), looking back in Trooper Nash's direction and calmly smoking his cigarette.

The undersigned affords little weight to Trooper Nash's observation of sweat forming on Defendant's forehead. It was a bright, sunny day, and Defendant was standing in direct sunlight for the duration of the stop. Furthermore, the video never shows any sweat on Defendant's forehead or face, and he is not seen wiping any sweat off of himself. On the two occasions when Defendant's face is closest to the dashboard camera (he quickly glances in the direction of the camera while talking to Trooper Sears during the initial search and again

while being handcuffed after the drugs were found) no sweat is visible.  See Video at 10:03:12 and 10:15:00.

The other two factors cited by Trooper Nash (Defendant's criminal history and the fact that Defendant was moving to Atlanta because the police in Mesquite had beat him up), do not provide reasonable suspicion, either alone, or in combination with the other nervousness-related factors cited by Trooper Nash.  There were no active warrants for Defendant.  The fact that Trooper Nash may not have ever heard anyone say that they were moving to another city because of confrontations with the police does not give him reasonable suspicion that Defendant was engaged in criminal behavior at the time of the traffic stop.

Trooper Nash did not articulate any characteristics of Defendant's car or the area in which he was stopped (I-20 in Bossier City) that caused him any suspicion that Defendant was engaged in drug trafficking or any other criminal activity. Furthermore, Defendant was stopped in the morning, not late at night, which is a factor cited by the Fifth Circuit in both Santiago and Jones.  See also United States v. Villalobos, 161 F.3d 285, 289 (5th Cir. 1998)(time of day that a vehicle is traveling is a "permissible consideration").

Trooper Nash candidly admitted that he decided he was going to search Defendant's car (or request consent to search the car) even *before* he had run Defendant's information through the computer and learned of Defendant's criminal history.  Tr. 50.  Nevertheless, an evaluation of *all* of the circumstances in this case, including the factors identified by

Trooper Nash in his testimony and the circumstances reflected in the video and audio recording of the stop, shows that Trooper Nash lacked reasonable suspicion to continue the detention of Defendant once he confirmed by radio that Defendant's driver's license was valid, the car was not stolen and there were no active warrants for Defendant.  However, Trooper Nash did not issue the citation to Defendant, return his driver's license and let him leave.  Instead, he extended the length of the detention approximately 13 additional minutes and interrogated Defendant further on such subjects as whether Defendant had cheated on his wife or vice versa.  That extension of the detention was not permitted absent reasonable suspicion gained prior to the extension, and there was none.[8]

Trooper Nash has been a trooper with the Louisiana State Police for five years, and the court should not overlook his experience or the inferences that he drew from the facts as he understood them.  Powell, 137 Fed.Appx. at 707 ("[C]ourts should err on the side of

---

[8]For the sake of clarity, some of the more important times shown on the videotape bear repeating: Nash made the traffic stop and called in Defendant's license plate at 9:33:55; Nash requested the NCIC checks from Texas and Georgia at 9:38:24; he received the Texas report at 9:41:34 and the Georgia report at 9:43:21; he exited his patrol car four minutes later at 9:47:10 and, instead of issuing a citation or letting Defendant leave, Nash detained and questioned Defendant further.

Nash then returned to his patrol car at 9:49:58; he exited his patrol car again, returned Defendant's license to him and issued the citation at 9:56:49 (approximately 13 minutes after the background checks were completed); Nash obtained oral consent to search at 9:57:53 and written consent at 9:59:30; Nash began the search at 10:02:00; Trooper Sears told Nash that Defendant withdrew his consent to the search at 10:04:20; and Sears walked his canine around Defendant's vehicle at 10:07:28.

deferring to the knowledge and experiences of a trained law enforcement officer's ability to distinguish between innocent and suspicious behavior."). Trooper Nash clearly had a hunch that Defendant was engaged in unlawful behavior at the time of the stop and, in hindsight, his hunch was absolutely correct.  But Trooper Nash's hunch is not enough to justify Defendant's continued detention after the initial purpose of the stop has been fulfilled.   He needed reasonable suspicion, and the Government has not satisfied the undersigned that there was reasonable suspicion for the continued detention in this case.

### C.  Consent to Search Following a Fourth Amendment Violation

The next issue is the effect of Defendant's consent to search, which he gave after the stop was unreasonably extended.  Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation.  Powell, 137 Fed.Appx. at 704-705. Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation.  Santiago, 310 F.3d at 342-343.  Where consent is preceded by a Fourth Amendment violation, the Government has a heavier burden of proving consent. Dortch, 199 F.3d at 201.

A two-pronged inquiry is used to determine whether consent following a Fourth Amendment violation is valid: (1) whether the consent was voluntarily given; and (2) whether it was an independent act of free will.  Id.  Even though voluntarily given, consent

does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will.  Santiago, 310 F.3d at 342.  To determine whether the causal chain was broken, the Fifth Circuit considers the following:  (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct.  The Government has the burden of showing admissibility.  Powell, 137 Fed. Appx. at 705, citing United States v. Chavez-Villarreal, 3 F.3d 124, 127 (5th Cir. 1993).

After considering all of the relevant factors, the undersigned finds that the Government has not met its burden in this case.  Defendant's consent was the product of his improper detention.  Defendant's oral and written consent (which were later withdrawn) were given immediately following the Fourth Amendment violation, and there were no intervening circumstances.  While Trooper Nash returned Defendant's driver's license to him, he never told Defendant that he was free to go.  Tr. 57.  There is also no indication from the video that Defendant ever believed he was free to leave.  Those facts do not satisfy the Government's burden of showing that Defendant's consent was an independent act of free will.

### D.  The Canine Alert

It is true, as the Government contends, that an alert by a trained canine provides officers with probable cause to search a car.  United States v. Sanchez-Pena, 336 F.3d 431, 444 (5th Cir. 2003)("We have repeatedly affirmed that an alert by a drug-detecting dog provides probable cause to search.");  United States v. Zucco, 71 F.3d 188, 191-192 (5th Cir.

1995)(once dog alerted to the interior wall of the van, police had probable cause to dismantle the wall).  However, by the time Trooper Sears' dog alerted on Defendant's car, it was too late.  Any probable cause established as a result of the canine alert was well into the period of the unlawful detention and cannot validate the search.  See Dortch, 199 F.3d at 200.

**Conclusion**

The undersigned believes that, under the circumstances presented to Trooper Nash, it was unreasonable for Trooper Nash to continue to detain Defendant after the computer checks were completed and Trooper Nash confirmed that Defendant's license was valid, the car was not stolen, and there were no outstanding warrants.  At that point, there was no additional reasonable suspicion that needed to be dispelled or confirmed.  Nash should have then issued a citation (or not) and released Defendant.  Instead, he continued to detain and question Defendant before he finally issued a citation and returned Defendant's license.  The continued detention of Defendant without reasonable suspicion violated his Fourth Amendment rights.  Defendant's subsequent consent to search was not an independent act of free will, but rather a product of the unlawfully extended detention.[9]

_____

[9]This case is distinguishable from another recent I-20 traffic stop case in this court where Trooper Nash stopped a vehicle for following too closely, obtained consent to search and then discovered illegal drugs.  In United States v. Hawk, 2006 WL 2591023 (W.D. La 2007), this court found reasonable suspicion of drug trafficking where Defendant and his passenger misrepresented their identities, they gave conflicting information regarding their itineraries, their extremely nervous behaviors were visible on the videotape, neither person was an authorized driver of the rented car, both had criminal histories, and Trooper Nash smelled a faint odor of burnt marijuana and a strong smell of air freshener coming from the car.  The differences between the two cases highlight the fact-intensive nature of the

Accordingly; **IT IS RECOMMENDED** that Defendant's Motion to Suppress (Doc. 29) be **granted.**[10]

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Cr. P. 59(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Cr. P. 59(b)(2).  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

―――――――――――――――――

reasonable suspicion inquiry.

[10]As summarized in a prior section of this Report and Recommendation, Defendant asserts other arguments in support of his Motion to Suppress.  However, if this recommendation is accepted, it is unnecessary to address those other contentions.

THUS DONE AND SIGNED at Shreveport, Louisiana, this 1st day of May, 2007.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE